# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ROBERT GULLEY, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EETHO BRANDS INC, d/b/a DOSE,<br><br>Defendant. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Robert Gulley ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this class action complaint against Defendant Eetho Brands Inc. d/b/a Dose ("Dose" or "Dose Daily" or "Defendant"). Dose owns and manages a website located at https://dosedaily.co (the "Website"), through which it markets, advertises, and sells functional wellness shots and related health products directly to consumers. The Website allows users to learn about Dose Daily's products, view product details and health-related information, create accounts, manage subscriptions, and complete online purchases.

## NATURE OF THE ACTION

1.     Courts have recognized that opaque digital tracking practices threaten consumer privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of a basic expectation of privacy in online activity.

2.      Defendant Dose owns and operates the Website, which allows users to browse information about its functional wellness shots and related health products, review product details and ingredient information, make online purchases, enroll in subscription offerings, manage customer accounts, and access customer support and other consumer-focused content. The Website references its use of cookies0F[1] and related tracking technologies within its Privacy Policy. The Website's Privacy Policy outlines its use of cookies, web beacons, and other tracking technologies, noting that Defendant defines "cookies" as "an alphanumeric identifier that a website can transfer to a customer's hard drive through a customer's browser. The cookie is then stored on the customer's computer as an anonymous tag that identifies the customer's computer, but not the customer."

3.      Defendant begins placing and transmitting third-party tracking technologies, including cookies and web beacons, immediately upon a visitor's initial visit to the Website, before users receive any meaningful notice or opportunity to control the interception or dissemination of their data. Dose transmits users' electronic communications and online activity via URLs, metadata, and cookies to third-party advertising and analytics companies (the "Tracking

---

[1] "Cookies" refer to small data files created on a user's device after receiving the necessary instructions and data from a website's server. These cookies can persist for days or years after being created, and their persistent nature allows cookies to be accessed on third party websites unrelated to the creator of the cookie. *See generally Using HTTP cookies*, Mozilla, https://developer.mozilla.org/en-US/docs/Web/HTTP/Guides/Cookies (last accessed Feb. 17, 2026).

2

Entities"), including TikTok, Meta (also referred to as Facebook), Google, Twitter, Reddit, Snapchat, and Microsoft (also referred to as Bing). Defendant's use of cookies, web beacons, and similar tracking tools (the "Tracking Tools") enables Tracking Entities to monitor users' activity, including webpage browsing activity, viewing specific products, and initiating checkout to purchase products, across the Website in real time and associate that activity with persistent identifiers.

4.     This tracking captures and transmits: (1) information contained in cookies, including identifiers that link to users' Facebook profiles; (2) detailed interaction and behavioral data, including links, buttons, forms, and other on-page elements interacted with by users, as well as information entered into search fields; (3) routing and addressing information, including location information, IP addresses, and persistent identifiers used to identify the source of communications and the destination for the data; and, (4) device and technical identifiers such as device type, operating system, browser type, visitor identifiers that enable recognition across sessions and websites, and approximate geolocation data. Collectively, this information is referred to herein as "Sensitive Information." The Tracking Entities use this data to infer users' interests, preferences, age, or other characteristics based on the users' behavior on the Website.

5.     These practices constitute an unlawful interception of electronic communications, and deprive users of control over their Sensitive Information,

resulting in concrete injury sufficient to confer Article III standing.

6.      Defendant claims in its Privacy Policy that cookies only "identif[y] the customer's computer, but not the customer."1F[2] This is false. Cookies, including the Facebook c_user cookie, personally identify Website users and track their activity on the Website.

7.      Defendant also claims in its Privacy Policy that "Third Parties cannot do anything with customer's personal information unless Dose has instructed Third Parties to do so."2F[3] This is false. Third-party Tracking Entities, such as Facebook and TikTok, collect users' personal information via the Tracking Tools and use it for their own marketing purposes.

8.      Indeed, the Tracking Entities, including Meta Platforms, Inc. (Facebook), TikTok Inc., Google LLC, X Corp. (Twitter), Reddit, Inc., and Snap Inc. (Snapchat), did not act as mere extensions of the Website or as agents of Defendant. Rather than merely facilitating Plaintiff's and Class Members' use of the Website, the Tracking Entities intercepted, collected, and used Plaintiff's and Class Members' electronic communications to build advertising profiles, sell targeted advertising to third parties, create lookalike audiences, train algorithms, and develop new products for the Tracking Entities' own commercial benefit.

---

[2] *Privacy Policy*, DOSE, https://dosedaily.co/pages/privacy-policy (last viewed on February 17, 2026).
[3] *Id*

9. Plaintiff accessed and used Defendant's Website on multiple occasions to review Dose Daily's products and engage in other product-related activities offered through the Website. Plaintiff's visits to the Website occurred while they were physically located in Minnesota. During those visits, Plaintiff's communications with the Website—including browsing activity, service selections, and related interactions—were intercepted, recorded, and transmitted to third-party Tracking Entities without Plaintiff's knowledge or informed consent, and immediately correlated with Plaintiff's identity. Plaintiff did not authorize any Tracking Entity to monitor, record, intercept, or disclose his website communications. Defendant's conduct allowed the Tracking Entities to unlawfully intercept and use Plaintiff's Sensitive Information, and Defendant fraudulently misrepresented the Website's data-collection practices. In doing so, Defendant violated the Federal Wiretap Act, 18 U.S.C. § 2510, et seq.; the Florida Security of Communications Act, Fla. Stat. § 934.01, as well as common-law prohibitions against unjust enrichment, common law fraud and deceit, and related statutory and common-law protections. Plaintiff brings this action on behalf of himself and a class of similarly situated users harmed by Defendant's deceptive and unlawful surveillance practices.

10. Federal and state legislatures have recognized and addressed individuals' privacy expectations in communications transmitted over wired and

electronic systems.

11.     Congress enacted the Federal Wiretap Act to prohibit the unauthorized interception of electronic communications.

12.     Defendant implemented and utilized the Tracking Tools to intercept, use, disclose, and record visitors' Sensitive Information. The Website does not provide notice of, or obtain consent for, these practices.

13.     Users of the Website, including Plaintiff, have an interest in maintaining control over their Sensitive Information and in preventing its misuse.

14.     Users of the Website have been harmed by Defendant's conduct, resulting in violations of the Federal Wiretap Act. In addition to monetary damages, Plaintiff seeks injunctive relief requiring Defendant to either remove the Tracking Tools from the Website or obtain appropriate consent from users.

15.     Plaintiff's claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiff seeks relief in this action individually and on behalf of users of the Website for violations of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e); Common Law Fraud, Deceit, and/or Misrepresentation and Unjust Enrichment.

**PARTIES**

16.     Plaintiff Robert Gulley is, and at all relevant times has been, a citizen and resident of the State of Minnesota. Plaintiff Gulley accessed and used

6

Defendant's Website for its intended consumer purposes in connection with Dose internet services. Most recently, in or about March 2025, Plaintiff visited the Website while physically located in Minnesota. These Tracking Tools operated without Plaintiff's knowledge or informed consent. As a result of Defendant's use of third-party Tracking Tools and its failure to provide effective and truthful disclosures regarding its data-collection practices, Plaintiff Gulley's Sensitive Information was intercepted and recorded unlawfully.

17.     Eetho Brands Inc. d/b/a Dose has its principal place of business in Miami, Florida. Dose owns and operates the Website https://dosedaily.co, through which it markets and sells its functional wellness shots and related health products directly to consumers, provides product information and promotional offerings, and allows users to create and manage accounts, purchase products, enroll in subscription programs, and access customer support resources. Dose Daily generates revenue through the online sale of its wellness products. In connection with its operation of the Website, Dose Daily deploys and permits third-party tracking technologies that collect, intercept, and transmit users' browsing activity, interactions, and device identifiers to advertising, analytics, and marketing partners.

**JURISDICTION AND VENUE**

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in

7

controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from at least one Defendant. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e).

19.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District.

20.     Venue is proper in this Court because Defendant has its principal place of business in Miami, Florida, in this District.

**FACTUAL ALLEGATIONS**

**I.      How Websites Function**

21.     Websites are hosted on servers, in the sense that their files are stored on and accessed from publicly accessible servers, where the server may also run software to manage and monitor the website. However, websites are, in large part, "run" on a visitor's internet browser, as the browser loads and processes the webpage's code to display the webpage and run various code scripts that provide certain functionality to the website. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.3F[4]

22.     Each webpage has a unique address in the form of a uniform resource

---

[4] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Jan. 6, 2026).

locator (URL), internet protocol address (IP address), and path. Two webpages cannot be stored at the same address.4F[5]

23.   When a visitor navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the URL), that visitor's browser contacts the DNS (Domain Name System) server, which translates the URL of that website into a unique IP (Internet Protocol) address.5F[6]

24.   An IP address is "a unique address that identifies a device on the internet or a local network."6F[7] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works. Id.

25.   When a visitor's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the webpage's URL. If the server fulfils this request, it issues an HTTP response (the "HTTP Response"), which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into

---

[5] *Id.*

[6]   *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Jan. 6, 2026).

[7]   *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Jan. 6, 2026).

the complete webpage upon arrival by the visitor's browser.7F[8]

26.     This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

27.     The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,8F[9] as depicted below:



*Figure 1 - Mozilla's diagram of a URL, including parameters*9F[10]

28.     Website owners or web developers write and manage the URLs for their websites.

29.     URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.10F[11] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

---

[8] *Id.*

[9] To see examples of how Defendant used parameters to provide additional information here, *see infra,* Section C(2).

[10]     *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Jan. 6, 2026).

[11] *Id.*

30. The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.11F[12] Today, UTF-8 is the Internet's most common character encoding.12F[13]

31. URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.13F[14] To demonstrate:



*Figure 21 – Demonstrating URL encoding and decoding*14F[15]

32. Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.

---

[12] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Jan. 6, 2026).

[13] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Jan. 6, 2026).

[14] *What IS URL Decoding and URL Encoding?*, GOCHYU (Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited Jan. 6, 2026).

[15] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Jan. 6, 2026).



*Figure 32 – Sample webpage used to demonstrate a webpage URL*



*Figure 43 – Request URL of sample webpage from Figure 3, encoded for transmission (compare with decoded URL in Figure 4)*

12



*Figure 54 – Decoded, parsed data from Request URL in Figure 4, showing easy-to-read parameters and metadata*

33.    After sending the Request URL, the server sends the HTTP Response to the visitor, and browser assembles the response packets sent by the server back into the HTML code of the webpage. The webpage code is then processed by the visitor's browser and "rendered" into a visual display according to the instructions of the webpage's source code, including HTML, CSS, and JavaScript code.15F[16] This is the visible, and usually interactable, website that appears on users' monitors.

34.    To provide more complex website functionalities, website developers will include more complex commands written in non-HTML programming languages such as JavaScript snippets, which are embedded or called within the

---

[16]    *How the web works?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Jan. 9, 2025).

13

HTML code.16F[17]

35.     Such complex tasks include order forms and inventory management, or code used to monitor and report visitor activity.

36.     In short, the Internet relies on a constant back and forth stream of requests to modify webpage content, navigate to new webpages, make internet purchases, or otherwise generally browse websites.

37.     Unbeknownst to users, as they browse and use the Website, the Tracking Tools capture and record both incoming and outgoing requests that make up users' communications with the Website.

### A. Defendant's Use of Tracking Tools Allows Tracking Entities to Spy on Users, Including Plaintiff.

38.     Defendant operates the Website and has installed the Tracking Tools. These Tracking Tools operate invisibly, tracking Defendant's site users' activity surreptitiously.

39.     Generally, the Tracking Tools collect information about users' site activity when events specified by Defendant—like searching for services or checking availability of products in specific geographic areas—are triggered. The Tracking Tools associate this information back to the website operators that installed the Tracking Tools via some identification number, such as a Pixel

---

[17]     *See    JavaScript    Basics*,    MOZILLA,    https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Jan. 6, 2026).

ID.17F[18]

40.     Parameters added to events by Defendant determine just how much data is collected, and how specific that data is.

41.     Parameters are strings of text that website owners add to a URL to track and organize their webpages.18F[19] URL parameters include key-value pairs formatted as "key=value":

1.     The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

2.     The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a visitor taking the action of adding a product to their online shopping cart)

---

[18] *See generally Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started/ (Dec. 24, 2025) (noting that the Pixel ID is part of the base code, which will result in the "download" of "a library of functions" related to that Pixel ID used "for conversion tracking"); *Conversion Tracking for Websites*, X Business, *How to create and access TikTok Pixel ID*, TikTok, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (instructing visitors that they must insert their pixel ID into the base code for operation tracking); https://ads.tiktok.com/help/article/how-to-create-and-access-tiktok-pixel-id?lang=en (last visited Jan. 6, 2026) (instructing visitors to create Pixel ID to setup and link data tracking).

[19] *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (Mar. 13, 2025), https://backlinko.com/url-parameters (last visited Jan. 6, 2026).



*Figure 6 - Diagram of a URL displaying how parameters function*19F[20]

42.     For instance, the Facebook Pixel (discussed and defined herein) transmission below shows that Defendant added a parameter to track events being triggered ("ev") and the event triggered here was the "ViewContent" event, among other parameters.



*Figure 7 - Facebook Pixel transmission displaying event parameter being collected and disclosed to Facebook*

---

[20] *Id.*

### 1.    *The TikTok Pixel*

43.    Defendant operates the Website and has installed on the Website software created by TikTok – known as a "tracking pixel" – that tracks Website users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

44.    The TikTok Pixel begins intercepting information as soon as the TikTok Pixel loads onto users' browsers.20F[21]

45.    To use the TikTok Pixel, the website operators must include the specific pixel IDs associated with their websites, which allows TikTok to link the collected data back to their individual TikTok business profiles.21F[22]

46.    Defendant's TikTok Pixel ID is included in transmissions sent to and from consumers' devices, as seen in Figures 9 and 10—the "sdkid" parameter in Figure 10 references the TikTok Pixel code library for Defendant's Pixel ID, whereas the "code" variable in Figure 10 identifies the TikTok Pixel ID, both of which reference the Pixel ID as "C8HHV71G3DM8EHQ3JMG".

47.    Defendant's TikTok Pixel shares information when an action is taken on the Website, based on events set up by Defendant.22F[23] These events can include

---

[21] *See* Aaron Katersky, *TikTok has your data even if you've never used the app: Report*, ABCNEWS (Mar. 16, 2023, 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249#:~:text=Webpages%20associated%20with%20everything%20from,consent%2C%20the%20Feroot%20report%20said. (last visited Dec. 22, 2025).

[22] *See generally Troubleshoot with Pixel Helper*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en (last visited Dec. 22, 2025) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).

[23] *About TikTok Pixel*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Dec. 22, 2025).

adding an item to a cart, making a purchase, when a specific button or element is clicked (like the search field), and when a URL with a specified keyword is visited.23F[24]

48.    The TikTok Pixel shares information when an action is taken on the Website, based on events set up by Defendant.24F[25] These events can include adding an item to a cart, making a purchase, when a specific button or element is clicked (like the search field), and when a URL with a specified keyword is visited.25F[26]

49.    TikTok Pixel users make use of events to collect even more specific data on users' activities, like the actions taken (e.g., clicking buttons, pages loaded, etc), the currency used for the purchase, the value of the purchase, and the type of content purchased.26F[27]

50.    The TikTok Pixel also collects:

    a.    The time website actions took place;

---

[24] *About Standard and Custom events*, TIKTOK, https://ads.tiktok.com/help/article/standard-events-parameters?lang=en (last visited Dec. 22, 2025) (describing standard "events"); *How to Set Up Events and Parameters with Events Builder*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Dec. 22, 2025) (describing how to designate events).
[25] *About TikTok Pixel*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Dec. 22, 2025).
[26] *About Standard and Custom events*, TIKTOK, https://ads.tiktok.com/help/article/standard-events-parameters?lang=en (last visited Dec. 22, 2025) (describing standard "events"); *How to Set Up Events and Parameters with Events Builder*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Dec. 22, 2025) (describing how to designate events).
[27] *How to Set Up Events and Parameters with Events Builder*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Dec. 22, 2025) (describing how to designate events).

b. The IP address (which determines the geographic location of an event);

c. Device information, including make, model, operating system, and browser information);

d. Cookies; and

e. Metadata and button clicks.27F[28]

51. The information the TikTok Pixel collects provides Defendant with a better understanding of who its customers are and how they navigate around the Website.

52. TikTok's "Advanced Matching" features allows Defendant to "match customer information such as email and phone number along with actions people take on [the Website]."28F[29] Once Advanced Matching is active, the TikTok Pixel will monitor user activity from users' browsers, and it "will automatically find customer information and match it with people on TikTok."29F[30] TikTok then provides Defendant with custom audiences based on website visitor events, like page views or purchases, to model lookalike audiences.30F[31] Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on

---

[28] *About TikTok Pixel*, TikTok, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Dec. 22, 2025).

[29] *About Advanced Matching for Web*, TikTok, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Dec. 22, 2025).

[30] *How to set up Automatic Advanced Matching*, TikTok, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Dec. 22, 2025).

[31] *Get started with the TikTok Pixel: a small business guide*, TikTok (Sept. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Dec. 22, 2025) (benefits of using the TikTok Pixel).

the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.31F[32]

53.     Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous users to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of Americans to improve Defendant's and TikTok's conversion rates and reduce overall advertising costs.32F[33]

54.     Defendant used the TikTok Pixel to monitor and log, in real time, when users clicked on specific products, loaded webpages, added specific products to cart, logged in to the Website, removed items from cart, and proceeded through the checkout process to payment and shipping.

55.     The TikTok Pixel also captures users' identifying cookies (the _ttp cookies is used to identify TikTok and non-TikTok users33F[34]), and email. The _ttp cookie was created on users', including Plaintiff's, devices by TikTok, either through use of the TikTok website or through Defendant's use of the TikTok Pixel, and was subsequently transmitted from users' devices to TikTok in combination

---

[32] *See How to use TikTok Pixel: TikTok conversions tracking*, LEADSBRIDGE (May 2, 2025), https://leadsbridge.com/blog/tiktok-pixel/ (last visited Dec. 22, 2025).

[33] *Id.*

[34]         *See      List      of      Cookies,*        https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Dec. 22, 2025).

with other Sensitive Information.

56.     Plaintiff had a reasonable expectation that: (i) Plaintiff's identifying information, (ii) information that designated Plaintiff as interested in purchasing or otherwise as a purchaser of the tracked products, and (iii) IP address and identifier information relating to who Plaintiff was obtaining these products from would not be exposed to third party trackers placed by Defendant.

57.     Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and access tons of data to run successful ad campaigns.34F[35]

58.     However, TikTok did not limit its use of Plaintiff's intercepted communications to providing services to Defendant.

59.     Instead, TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve their own products and services and to generate their own benchmarking reports to share with other TikTok customers.35F[36]

60.     According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately links to data harvesting platforms that pick off usernames and

---

[35] *See Benefits of using the TikTok Pixel*, TIKTOK, https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel?acq_banner_version=73412989 (last visited Dec. 22, 2025).
[36]     *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Dec. 22, 2025).

passwords, credit card and banking information and details about users' personal health."36F[37] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."37F[38]

61.     An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:



*Figure 8 – Home page of Website*

---

[37] *See* Aaron Katersky, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Dec. 22, 2025).
[38] *Id.*



*Figure 9 – Using a browser's "developer tools" on a Dose Daily webpage shows the Website loading TikTok Pixel's code onto the user's browser*

*Figure 10 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website, including AdvancedMatching and AutoAdvancedMatching*

62.    The Website instantly sends communications to TikTok when a user

views the page and tracks page interactions. In the example below, *Figure 10* shows the various TikTok scripts being run by Defendant when a user visits the webpage depicted in *Figure 11*, and the electronic impulses being sent to TikTok to add to their collection of user behavior:



*Figure 11 – Sample product on the Website*



*Figure 12 – Information collected via the TikTok Pixel when a user visits the sample webpage from Figure 11*

63.     The TikTok Pixel also collects personally identifiable information, such as email addresses from Website users. When a user logs into the Website, the

TikTok Pixel collects their email address, as shown in the figure below.

*Figure 13 – The TikTok Pixel collecting a user's email address on the Website*

64.     To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms").

65.     The TikTok Terms inform website owners using the TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.38F[39]

66.     The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts, and subsequently match those accounts with the users' corresponding event data.39F[40]

67.     TikTok obligates TikTok Pixel users, such as Defendant, that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."40F[41] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

68.     TikTok educates or reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."41F[42]

---

[39]  *TikTok   Business   Products   (Data)   Terms*,   TIKTOK (July   29,   2024), https://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Dec. 22, 2025).
[40] *Id.*
[41] *Id.*
[42] *Id.*

69.     As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel, and ignored TikTok's warnings to safely handle its users' data and warn its users' that the Website would disclose their information in a manner that threatened their private information.

### 2.     *The Facebook Pixel*

70.     Facebook offers its own tracking pixel (the "Facebook Pixel") to website owners for the purpose of monitoring visitor interactions on their websites, which can then be shared with Facebook.

71.     The Facebook Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.42F[43]

72.     Upon creating a Pixel, a Pixel ID (also called a DataSet ID by Meta), is generated.43F[44] This Pixel ID is used to initialize the Pixel, either by allowing Meta to fetch a pre-determined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used receive the collected data

---

[43]     *Set     up     and     install     the     Meta     Pixel*,     FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Jan. 6, 2026).
[44] *Id.*

when programming the Pixel directly into a website.44F[45]

73.     This Pixel ID must match "a known Pixel ID" in Meta's system,45F[46] and is transmitted by the Meta Pixel.46F[47]

74.     As Facebook notes, the Pixel must be added to each individual page that a website owner wishes to be tracked.47F[48]

75.     Once added to a webpage, the Pixel begins intercepting information as soon as a visitor visits the webpage and the Pixel loads onto the visitor's browser.48F[49]

76.     The Pixel is employed by Defendant to gather, collect, and then share visitor information with Facebook.49F[50] Receiving this information enables Facebook and Defendant to build valuable personal profiles for Website users to inform its targeted advertising campaigns, enhancing marketing effectiveness and

---

[45] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Jan. 6, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[46] *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Jan. 6, 2026).

[47] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan. 6, 2026).

[48] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Jan. 6, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[49] *See* Mario Neto, *What is the Facebook Pixel – Different ways to collect data to boost your ads performance*, BIRCH BLOG (May 13, 2025), https://bir.ch/blog/what-is-the-facebook-pixel#:~:text=Putting%20it%20simply%2C%20the%20Meta,all%20from%20a%20single%20snippet. (last visited Jan. 6, 2026).

[50] The Facebook Pixel allows websites to track visitor activity by monitoring visitor actions ("events") that websites want tracked and share a tracked visitor's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan. 6, 2026).

increasing the chance of converting users into paying customers.50F[51]

77.    The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location and finding the people who are most likely to take action and view content.51F[52]

78.    Once implemented on a website, the Facebook Pixel begins to share users' information the moment a visitor lands on the website.

79.    When a Facebook visitor logs onto Facebook, tracking cookies, including the c_user cookie, the datr cookie, and the fr cookie, are automatically created and stored on the visitor's device.52F[53] When visiting webpages containing the Facebook Pixel, these cookies are copied and transmitted via the Facebook Pixel, allowing Facebook to link the Sensitive Information it receives through the Facebook Pixel to individual Facebook profiles.

80.    The c_user cookie, for example, contains a series of numbers (the visitor's Facebook ID, or "FID") to identify a visitor's profile.

*Figure 14 – Sample c_visitor cookie, containing FID of test account created by Plaintiff's counsel to investigate the Facebook Pixel*

---

[51] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Jan. 6, 2026).

[52] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Jan. 6, 2026).

[53] *Cookies Policy: What are cookies, and what does this policy cover?*, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Jan. 6, 2026).

81. The FID can simply be appended to www.facebook.com/ to navigate to the visitor's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 14 and* appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832), will redirect the webpage straight to the Facebook profile associated with the FID, as depicted below:



*Figure 15 – Sample Facebook account created by Plaintiff's counsel to investigate the Facebook Pixel, with FID highlighted in URL*

82. The Facebook Pixel tracks visitor-activity on web pages by monitoring

events,[53F][54] which when triggered, causes the Pixel to automatically send data – here, users' Sensitive Information – directly to Facebook.[54F][55] Examples of events utilized by websites include: (i) a user loading a page with a Pixel installed (the "PageView event");[55F][56] (ii) when a user views pre-designated content, like products for sale (the "ViewContent" event);[56F][57] (iii) when a user clicks on a designated button or area of a webpage (the "SubscribedButtonClick event"); and (iv) when a user adds a product to their shopping cart (the "AddToCart" event, collectively with PageView event, SubscribedButtonClick event and ViewContent event, the "Pixel Events").[57F][58] The Website utilizes all of these Pixel Events.[58F][59]

83.    Defendant's use of the Facebook Pixel also transmits its unique Pixel ID via the "id" parameter, which contains Defendant's Pixel ID of "247670833036728."

84.    Defendant uses the Facebook Pixel to monetize its Website users'

---

[54]    *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Jan. 6, 2026).

[55] *See generally id.*

[56]    *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Dec. 22, 2025).

[57]    *Reference: standard events*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/reference/ (last visited Dec. 22, 2025).

[58] *Id.*

[59] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Dec. 22, 2025).

Sensitive Information.

85.     Facebook independently benefits from the data collected through the Facebook Pixel by using the harvested data to sell targeted advertising services. Through the use of users' Sensitive Information, Facebook refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

86.     Defendant's use of the Facebook Pixel on the Website is demonstrated by the screenshots below, which follow a visitor's journey on the Website from *Figure 11*.





*Figure 16 – Facebook Pixel tracking a visitor landing on the webpage from Figure 11 through the "PageView" event*





*Figure 17 – Facebook Pixel tracking a visitor viewing the page from Figure 11 through the "ViewContent" event*





*Figure 18 – Facebook Pixel tracking a visitor's click choices when navigating to the sample webpage from Figure 11 through the "AddToCart" event*

87.    When a business applies with Facebook to use the Facebook Pixel, it is provided with detail about its functionality, including with respect to Sensitive Information.59F[60]

88.    To make use of the Facebook Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

89.    The Facebook Terms informs website owners using Facebook's Pixel that the employment of the Pixel will result in data sharing, including with

---

[60] *See Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 6, 2026) (The Pixel "relies on Facebook cookies, which enable us to match your website users to their respective Facebook Visitor accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

Facebook, through the automatic sharing of Pixel Event information and contact information.[60][61]

90.     The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against visitor IDs, as well as to combine those visitor IDs with corresponding [Pixel Event information]."[61][62]

91.     Facebook directs parties implementing the Facebook Pixel—here, Defendant—to encrypt request information[62][63] *before* data can be shared.[63][64]

92.     Facebook further provides Facebook Pixel users, such as Defendant, guidance on responsible data handling, and details how data is acquired, used, and stored, including which information is shared with Facebook.

93.     Facebook educates or reminds Facebook Pixel users of their responsibility to inform their users of their website's data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third-party.[64][65]

---

[61]     *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGod nMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Jan. 6, 2026).

[62] *Id.*

[63] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method which makes users' information visible. *See id.*

[64] *Id.*

[65]     *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Jan. 6, 2026).

94.     As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Facebook Pixel, and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' Sensitive information.

### 3.     Google Tracking Tools

95.     Google offers a range of advertising products, each serving a distinct function within advertising portfolios.

### a.  Google Analytics

96.     Like the Facebook Pixel, Google Analytics ("GA") collects data about visitor interactions with a website. That data includes link clicks, button clicks, form submissions, conversions, shopping cart abandonment, items added to or removed from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[66]

97.     GA transmits collected interaction data to Google, which associates the activity with the website that generated it.[67] Notably, Google notifies web developers that developers should provide "visitors with clear and comprehensive

---

[66] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited Jan. 6, 2026).

[67]         *About      the      Google      tag*,        GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited Jan. 6, 2026).

information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[67F][68]f

98.     GA functions through specific collection settings and fixed data transmission paths. Google acknowledges the legal implications of those practices and assigns responsibility for visitor disclosure to website developers, including Defendant.

99.     To use GA the website operators must include the specific Google Tag ID associated with their websites, which allows Google to link the collected data back to their profile on Google products.[68F][69]

100.   Defendant's Google Tag ID is included in transmissions sent to and from users' devices, as seen in *Figure 19*—the HTTP request URL contains the Google Tag ID, listed after "tid=", and referenced as "G-DK6XVYT8VR".

101.   Here, Defendant added GA to the Website. That implementation caused Plaintiff's communications with the Website to be intercepted and transmitted to Google, as shown by the example taken directly from the Website below:

---

[68] *Id.*

[69]           *About            the            Google            Tag* https://support.google.com/tagmanager/answer/11994839?hl=en&ref_topic=14595647&sjid=11744702880709055388-NA (last visited Jan. 7, 2026).



*Figure 19 – Communications on the Website shared with Google Analytics*

102. After the data reaches those common destinations, Google products analyze the information and provide feedback that allows Defendant to monetize the collected data through targeted advertising.

### b. *Google Ads*

103. Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web users.69F[70]

104. The process advertisers using Google Ads to display ads within text-based search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target

---

[70] *Achieve all your goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited Jan. 6, 2026).

audience, intended to trigger their ads to appear within the user's search results;70F[71] (iii) Google then allows advertisers to bid on those various keywords;71F[72] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

105. Google AdSense works in conjunction with the Google Ads bidding system and allows website owners to display Google Ads on their websites and earn a revenue share when ads are viewed or clicked.72F[73] The search terms bid on through Google Ads are used by website owners participating in Google AdSense, allowing those owners to share in advertising revenue generated by Google.

106. AdSense for content or AdSense for search are methods by which AdSense functions.73F[74] In either configuration, AdSense matches advertisements to website users based on the content of the website and user activity.

107. Google Ads intercepted Plaintiff's search terms, as depicted, below, using the sample search "dose for your liver."

---

[71] *Reach the right people with Search ads*, GOOGLE ADS, https://ads.google.com/home/campaigns/search-ads/ (last visited Jan. 6, 2026).
[72] *Id*.
[73] *Home*, GOOGLE ADSENSE, https://www.google.com/adsense/start/how-it-works/ (last visited Jan. 6, 2026).
[74] *AdSense revenue share*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/180195?hl=en (last visited Jan. 6, 2026).



*Figure 20 – Test search made on the Website resulted in sharing Search Terms with Google Page Ads*

108. Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

109. Through Google AdSense, Google aggregates search data collected from website users. Google uses that data to improve its services and deliver more relevant search results. By analyzing patterns and trends in user behavior, Google gains insight into what users search for and what they are interested in. That insight supports service improvements, product development, and revenue growth.

110. Google's collection and analysis of search results also allows it to

41

improve its machine learning algorithms.74F[75] Google uses data on how users interact with search results to train its algorithms to provide more accurate and relevant search results.75F[76] For example, when a user clicks on a particular search result and spends more time on that page, Google treats that interaction as a signal of relevance to the search query. By aggregating such data across users, Google can develop advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.76F[77]

111.    Google profits in several ways from the Website's use of the Google search engine: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense search, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate user search data allows Google to further tailor its products to advertisers and users by training its algorithms on large volumes of search data.

### 4.    The Twitter Pixel

112.    X Corp. f/k/a Twitter ("Twitter") also offers its own website tag that can be implemented into websites to track users' site actions or conversions (the "Twitter Pixel").

---

[75] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited Jan. 6, 2026).
[76] *Id.*
[77] *Id.*

113.   To make use of the Twitter Pixel, website owners, such as Defendant, must take several affirmative steps: They must generate the Twitter Pixel and create events to track, implement the Twitter Pixel base code across their website, and implement event code in key locations on their website, like when a user makes a purchase.77F[78]

114.   With each event, website owners like Defendant can select the user action they want to track and the parameters to share about the action.

115.   Events can include viewing a page, making a purchase, adding an item to the shopping cart, using the search bar, adding a product to the wish list, adding payment information, and customizing a product.78F[79]

116.   Parameters can include the contents of the action, the search terms used on the website, the email address of the user taking the action, the value of the product purchased, and the currency the purchase was made in.79F[80]

117.   As soon as the Twitter Pixel is placed on a website, it begins to collect information, including the cookie IDs of users, to match them to Twitter users for the purpose of developing custom audiences to market and advertise to.80F[81]

---

[78]   *X Pixel*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited September 17, 2025).
[79]   *Event Types and Parameters*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited September 17, 2025).
[80] *Id.*
[81] *Website Activity Custom Audiences*, X BUSINESS, https://business.x.com/en/help/campaign-setup/campaign-targeting/custom-audiences/website-activity (last visited September 17, 2025).

118.   Twitter allows website owners, such as Defendant, to create "Website Activity Audiences," a type of custom audience, which enables Twitter to collect and analyze user activity for users who have visited or taken certain actions on Defendant's Website. Once an audience is created and the Twitter Pixel collects 100 Twitter users, the audience will be ready to use for targeting in ad campaigns.81F[82]

119.   The data collected by the Twitter Pixel informs both Defendant and Twitter how to optimally target custom audiences with advertising based on the geo, gender, age, and device criteria specified by Defendant.82F[83]

120.   An image of the invasive Twitter code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to Twitter to add to its collection of user behavior when a user visits the sample webpage in *Figure 11*:



*Figure 21 - Twitter Pixel active on the Website*

121.   To use the Twitter Pixel, Defendant agreed to Twitter's policies for

---

[82] *Id.*
[83] *Id.*

conversion tracking and custom audiences (the "Twitter Terms").

122.   The Twitter Terms are transparent that Twitter will process users' data to match contact details against corresponding accounts, and subsequently match those accounts with the users' corresponding event data.83F[84]

123.   Twitter obligates Twitter Pixel users, such as Defendant, that they "must provide their application customers with legally sufficient notice that they are working with third parties to collect customer data through their application for purposes of conversion tracking and serving ads targeted to customers' interests, and obtain legally sufficient consent from their customers for these activities."84F[85]

124.   Twitter makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Twitter.

125.   Twitter educates or reminds Twitter Pixel users of their obligation to be honest with their consumers and not to select "targeting criteria that could reveal sensitive information" about consumers.85F[86]

126.   As a sophisticated party entering into a business arrangement with

---

[84]   *Policies for conversion tracking and custom audiences*, X BUSINESS, https://business.x.com/en/help/ads-policies/campaign-considerations/policies-for-conversion-tracking-and-custom-audiences#:~:text=*%20Advertisers%20may%20not%20create%20advertisements%20which,is%20otherwise%20prohibited%20by%20our%20Ads%20Policies. (last visited September 17, 2025).
[85] *Id.*
[86] *Id.*

another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Twitter Pixel, and ignored Twitter's warnings to safely handle its users' data and warn its users' that the Website would disclose their information in a manner that threatened their sensitive information.

### 5.    *The Reddit Pixel*

127.   Additionally, Defendant has installed a tracking pixel on its Website created by social media platform, Reddit (the "Reddit Pixel").

128.   The Reddit Pixel is a piece of code that can be added to a website by a website owner to track users on the website and record the actions the users take.86F[87] The harvested data is subsequently used by the website owner to serve targeted ads to website users on Reddit.

129.   The Reddit Pixel is also used in conjunction with Reddit's Conversion API to track specific actions that users take on the websites ("events"), such as viewing a page, submitting a search in the website's search bar, adding a product to the visitor's cart, checking out, and other specified events.87F[88]

130.   Reddit makes use of a website owner's pixel ID to determine which data should be tracked when sending the code for the Pixel to the user's

---

[87] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Dec. 22, 2025); *Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Dec. 22, 2025).
[88] *Conversion Events*, REDDIT, https://business.reddithelp.com/articles/Knowledge/supported-conversion-events (last visited Dec. 22, 2025).

browser,[88][89] and to specify "which business account should receive" the user's tracking data.[89][90]

131.   In Defendant's use of the Reddit Pixel, Defendant configured the Reddit Pixel to include a parameter called "id" which identifies Defendant's Reddit Pixel ID as "a2_hok9xuwuk72d". This data is sent both when receiving communications from the Website and as users send communications to the Website.

132.   Website owners, like Defendant, can enable a feature of the Reddit Pixel known as "Auto-Advanced Matching" to determine the exact identity of Reddit users who visit the website.

133.   Auto-Advanced Matching automatically scrapes a website for any email addresses typed or inserted by a visitor and sends that email information to Reddit.[90][91]

134.   In addition to email addresses, a website owner can enable the Reddit Pixel and the Conversion API to send additional personal information to Reddit, known as "match keys," to identify website users.[91][92]

---

[89] *See Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Dec. 22, 2025).
[90] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Dec. 22, 2025).
[91] *Auto-Advanced Matching*, REDDIT, https://business.reddithelp.com/s/article/automated-advanced-matching (last visited Dec. 22, 2025).
[92] *About Match Keys*, REDDIT, https://business.reddithelp.com/s/article/about-match-keys#customer-match-keys-and-identifiers (last visited Dec. 22, 2025).

135.   IP addresses are match keys website owners are *required* to send to Reddit, while other match keys may be used, including:

    a)   Email addresses;

    b)   Phone numbers;

    c)   Mobile Advertising IDs (a unique identifier for a mobile user);

    d)   Reddit Click IDs (to attribute click conversions more accurately);

    e)   External IDs (an advertiser-assigned identifier that enhances match accuracy);

    f)   Reddit UUIDs (a unique ID generated by the Reddit Pixel);

    g)   Cookies, such as the logged out ID or "loid" cookie;

    h)   User Agents (which identifies the software the user is using to access the website); and

    i)   The visitor's screen dimensions.92F[93]

136.   The Reddit loid cookie allows Reddit to track Reddit users who are not logged in. This cookie is placed by Reddit directly ont Reddit users' devices, after which it is accessed by the Reddit Pixel and combined with other Sensitive Information before being transmitted to Reddit. This cookie, and the other match keys, can be used by Reddit to match an otherwise anonymous website visitor to their Reddit account, or even to identify them outright, associating their identity with their activity on the website.

137.   Reddit uses this data to help advertisers, including Defendant, gauge the effectiveness of their ad campaigns, improve their ability to attribute activity to

---

[93] *Id*

specific ad campaigns, track users across devices, and help them create more precisely targeted ad campaigns.93F[94]

138.  Additionally, Reddit employs this data to optimize their own ad placements and to develop new services.94F[95]

139.  Defendant's use of the Reddit Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to searching for and purchasing a product on the Website.



*Figure 22 – Reddit Pixel tracking a user visiting the webpage from Figure 11 through the "PageVisit" event*



*Figure 23 – Reddit Pixel tracking a user adding the product from Figure 11 to their cart through the "AddToCart" event*

---

[94] *Id.*

[95] *Reddit Privacy Policy*, REDDIT (Aug. 16, 2024), https://www.reddit.com/policies/privacy-policy#policy-h2-4 (last visited Apr. 10, 2025).

140.   To utilize the Reddit Pixel, Defendant agreed to Reddit's Business Tool Terms (the "Reddit Terms").

141.   The Reddit Terms informs website owners, such as Defendant, that the employment of the Reddit Pixel will result in data sharing, including with Reddit, of users' website actions, email addresses, cookie IDs, and device IDs, among other "matching parameters."[95F][96]

142.   The Reddit Terms make clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Reddit.

143.   The Reddit Terms explicitly conditions the use of the Reddit Pixel on website owners' warranties that they: (i) provide "prominent and legally-sufficient notice" of the Reddit Pixel's data sharing to users; (ii) provide "clear, prominent and legally sufficient instructions regarding how to opt out of data collection and use of such data collection and use;" and (iii) do not share "any data related to users who have not provided consent[.]"[96F][97]

144.

As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that

---

[96]   *Reddit Business Tool Terms*, REDDIT (Jan. 1, 2025), https://business.reddithelp.com/s/article/Reddit-Business-Tool-Terms (last visited Dec. 22, 2025).
[97] *Id.*

would result from use of the Reddit Pixel, and ignored Reddit's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

### 6.   *The Snap Pixel*

145.   Defendant also installed code on the Website created by Snapchat that tracks Website users' actions, behavior, and conversions across the Website (the "Snap Pixel").

146.   To make use of the Snap Pixel, Defendant must create a Snapchat Ads manager account, create a pixel, receive a Pixel ID, select the information to be collected, follow specific guides for integration with third party software like Spotify or Google Tag Manager, and determine whether to enable automated matching for the Snap Pixel.97F[98]

147.   The Snap Pixel is a piece of JavaScript code provided by Snapchat that allows advertisers, such as Defendant, to track user actions and behavior on websites for the purpose of measuring ad performance, optimizing ad campaigns, and building targeted audiences for better advertising results.98F[99]

---

[98]   *Getting Started with Enabling the Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-website-install?language=en_US&r=692&ui-knowledge-components-aura-actions.KnowledgeArticleVersionCreateDraftFromOnlineAction.createDraftFromOnlineArticle=1 (last visited Dec. 22, 2025).

[99] *Using the Snap Pixel*, SNAPCHAT (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Dec. 22, 2025); *see also Snapchat Pixels*, SPRINKLR, https://www.sprinklr.com/help/articles/snapchat-pixel/snapchat-

148.   "For the Pixel to work, [Snapchat] must receive a Pixel ID and a standard event type[,]" at a minimum.99F[100]

149.   The Pixel ID is an "[a]dvertiser specific ID . . ."100F[101] where the Pixel ID is used to initialize the Snap Pixel's tracking,101F[102] identifying which advertising account receives the collected data.

150.   This software may be automatically or manually added to a website's webpages, but in either case, the software must be added to each webpage being tracked.102F[103]

151.   Key features of the Snap Pixel include tracking user actions ("events") designated by advertisers, such as page views, add-to-cart actions, purchases, and sign-ups.103F[104] Advertisers, such as Defendant, can add additional parameters to these events for more granular insights, like purchase value or product type

---

pixels/640739d87517d84a3aaf2d26 (last visited October 09, 2025); Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/ (last visited Dec. 22, 2025).

[100] Snap Pixel FAQ, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-faq?language=en_US (last visited Dec. 22, 2025).

[101] *Snap Pixel Helper Glossary*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-helper-glossary?language=en_US (last visited Dec. 22, 2025)

[102] *See About Snap Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US (last visited Dec. 22, 2025)

[103] *See Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Dec. 22, 2025).

[104] *Pixel Event Examples*, SNAPCHAT, https://businesshelp.snapchat.com/s/topic/0TO8b000000P8xxGAC/pixel-event-examples?language=en_US (last visited Dec. 22, 2025).

information.104F[105] The information is collected immediately as users land on the website where the pixel is installed. 105F[106]

152.   The Snap Pixel also allows cross-device tracking, enabling tracking across multiple devices to provide a comprehensive view of a customer's journey.106F[107]

153.   The Snap Pixel collects:

a) The time the website actions occurred;107F[108]

b) Device information such as the hardware model, operating system, and browser type used;108F[109]

c) Cookies;109F[110]

d) Metadata such as button clicks, time spent on the site, conversations, and page visits;110F[111] and

---

[105]      *Additional Parameters Example*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/additional-parameters?language=en_US (last visited Dec. 22, 2025).

[106] *Using the Snap Pixel*, SNAPCHAT (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Dec. 22, 2025); *see also* Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/ (last visited Dec. 22, 2025).

[107]      *About Snap Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US#:~:text=The%20Snap%20Pixel%20is%20a,to%20manage%20your%20privacy%20settings (last visited Dec. 22, 2025).

[108]      *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Dec. 22, 2025).

[109] *Privacy Policy*, SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy (last visited Dec. 22, 2025).

[110] *Cookie information*, SNAP (Apr. 8, 2025), https://www.snap.com/privacy/cookie-information (last visited Dec. 22, 2025).

[111] Ate Keurentjes, *How do you install the Snap Pixel via Google Tag Manager*, TAGGRS (Oct. 23, 2025), https://taggrs.io/en/snap-pixel/ (last visited Dec. 22, 2025).

e) IP addresses for general geographic data.111F[112]

154.  The Snap Pixel enables website owners, such as Defendant, to understand how users navigate to their site. This data helps Defendant refine their advertising strategies by identifying high-performing campaigns and optimizing ad spending.112F[113]

155.  The Website's Snap initialization code, and Pixel event activations, transmit Defendant's Pixel ID in the form of a URL parameter named "pid", which contains Defendant's Snap Pixel ID value of "acae5fb0-74a8-456d-adae-cle71e71fa98". This data is sent both when receiving communications from the Website and as users send communications to the Website.

156.  The information the Snap Pixel collects provides Defendant with a better understanding of who its customers are, and how they navigate around the Website.

157.  Snap also independently benefits from non-customer list audience information.113F[114]

158.  The harvested data collected by the Snap Pixel is used by Defendant

---

[112] *Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Dec. 22, 2025); *see also Privacy Policy*, SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy (last visited Dec. 22, 2025); *Data Processing Agreement*, SNAP (July 25, 2025), https://www.snap.com/terms/data-processing-agreement (last visited Dec. 22, 2025).

[113] Aldeghi, *supra* note 2.

[114] *See Privacy Policy, Section 2(g),* SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy (last visited Dec. 22, 2025).

to create custom audiences.114F[115] Defendant can retarget users who viewed specific pages or made purchases and build lookalike audiences to reach new users with similar characteristics.115F[116]

159.   Put simply, the Snap Pixel collects as much data as it can about otherwise anonymous users to the Website and matches it with existing data Snapchat has acquired and accumulated about millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.

160.   Snap Pixel requires advertisers, such as Defendant, to integrate code into their website's header or use tools like Google Tag Manager for a seamless setup.116F[117] Advertisers, such as Defendant, are encouraged to use tools like Snap Pixel Helper to verify proper installation, ensure accurate event tracking and track user activity.117F[118]

161.   Defendant, through the Snap Pixel, uses data and cookies to track users and serve them relevant ads on Snapchat based on how they interacted with the Website.118F[119] The data received from Snapchat conversion tracking allows Defendant to serve highly targeted ad campaigns to the right people.119F[120]

[115] Aldeghi, *supra* note 2.
[116] *Id.*
[117] *Id.*
[118]   *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Dec. 22, 2025).
[119] *Id.*
[120] *Id.*

162.   Using Snap Pixel helps Defendant collect important information about the people who buy from them so that Defendant, in turn, can benefit. Here are some of the biggest benefits:

a) **Measure conversion events that matter**: See all the actions users take on the Website, across all devices, and attribute conversions back to ad campaigns.

b) **Reach the perfect audience**: Defendant can create custom audiences and lookalike audiences based on the specific actions users have taken on the Website.

c) **Optimize advertising campaigns**: Use real-time insights to optimize delivery of Defendant's campaigns for more effective results.120F[121]

163.   An image of the invasive Snap Pixel code secretly embedded on Defendant's Website can be seen here:

---

[121] *Benefits of Using the Snap Pixel*, SNAPCHAT, https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Dec. 22, 2025).



*Figure 24 - Snap Pixel active on the Website*

164. When the Snap Pixel triggers, it captures the relevant data and sends a transmission to Snapchat's servers as depicted in the picture above, which shows Defendant's Snap Pixel instantly sending communications to Snapchat as users take certain actions on the Website, like viewing a page.

165. The Snap Pixel's functionality is not disclosed on the Website.

166. By using the Snap Pixel and providing Snapchat with users' information, Defendant had to agree to Snapchat's Personal Data Terms (the "Snap Terms"), among other agreements governing the use of the Snap Pixel.

167. By agreeing to the Snap Terms, Defendant represented and warranted that the personal data it shares with Snapchat will not contain any information about individuals under the age of 13 or any sensitive information or special category

data.121F[122]

168.   The Snap Terms further requires Snap Pixel users, such as Defendant, of their responsibility to secure and maintain "all necessary rights, licenses and consents required to provide or make available the personal data" shared through the Snap Pixel.122F[123]

169.   As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from the use of the Snap Pixel, and ignored Snapchat's warnings to safely handle its users' data and to warn its users that the Website would disclose their information in a manner that threatens their private information.

## II.   Plaintiff Did Not Consent to be Tracked by Defendant's Use of the Tracking Tools.

170.   The Tracking Tools actively began to track users the moment they arrived on the Website.

171.   Users were, therefore, being tracked as soon as they landed on the Website home page.

172.   Defendant's privacy policy notifies users that "Dose and/or its Third Parties, collects non-identifiable and personal information through the use of

---

[122] *Personal Data Terms*, SNAP (Dec. 9, 2024), https://www.snap.com/terms/personal-data#:~:text=In%20summary%3A%20you%20provide%20a,information%3B%20you%20obtained%20any%20necessary (last visited Dec. 22, 2025).
[123] *Id.*

various technologies, including "cookies."123F[124]

173.  Defendant's privacy policy explains that personal identifying information is collected only "during a transaction", is extracted in a "non-identifiable format", and is only analyzed at an "aggregate level" and not "reviewed an individual level."124F[125]

174.  This is false. The Tracking Entities receive personally identifiable information about Website users when they browse the Website; Facebook receives it through the c_user cookie and TikTok receives it through users' email addresses. This information is processed by Facebook and TikTok for their own marketing purposes on an individual level.

175.  Defendant, under the "Uses Made of the Information." section, also claims that "Dose will not use your personal identifiable information for any purpose other than that for which it is submitted."125F[126]

176.  This is false. Users submit their email address to sign in to the Website. Dose then shares that email address with TikTok, and allows TikTok to collect that email address, for analytics and marketing purposes.

177.  Defendant also mentions that they partner with Third Parties such as Google and Facebook for analytics, and that they may "collect information

---

[124] *Dose's Privacy Policy*, DOSE, https://dosedaily.co/pages/privacy-policy (last visited February 17, 2026).
[125] *Id.*
[126] *Id.*

regarding customer's usage of the Website."126F[127] Defendant purposefully omits the fact that it partners with TikTok.

178. Defendant's Privacy Policy fails to disclose the use of tracking cookies, many of which identify users by allowing Facebook to link users to their collected data, including Meta's c_user cookie, datr cookie,127F[128] and fr cookie.128F[129]

179. Reasonable users, including Plaintiff, expected Defendant to abide by the privacy practices it established in its Privacy Policy, and that their PII would not be automatically collected and used by Tracking Entities at Defendant's invitation.

## **TOLLING**

180. Defendant's conduct tolled the statutes of limitations applicable to Plaintiff's and the Class's claims, based on delayed discovery.

181. Plaintiff and Class Members did not know, and could not have known, that the Tracking Tools disclosed their information and communications to Tracking Entities when they used the Website. Reasonable diligence would not

---

[127] *Id.*

[128] The datr cookie contains "a unique identifier for [a visitor's] browser . . . [and] has a lifespan of two years." *Security, site and product integrity*, FACEBOOK, https://www.facebook.com/privacy/policies/cookies/version/cookie_policy_2022/?subpage=subpage-1.2 (last visited Jan. 6, 2026).

[129] The fr cookie contains an encrypted Facebook visitor ID and browser ID, and has a lifetime of 90 days on a visitor's device. *See Cookie Policy*, BMW, https://bavarianmotorcars.com/en/cookie-policy (last visited Jan. 6, 2026); *Advertising, recommendations, insights and measurement*, FACEBOOK, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 (last visited Jan. 6, 2026).

have revealed Defendant's conduct.

182. Defendant embedded the Tracking Tools into the Website without disclosure, providing no indication that communications would be shared with Tracking Entities.

183. Defendant possessed exclusive knowledge that the Tracking Tools would disclose protected information and confidential communications. Defendant failed to disclose that interacting with the Website would result in disclosure of Sensitive Information to Tracking Entities.

184. The technical nature of the Tracking Tools prevented the discovery of the full scope of Defendant's conduct. No disclosures or visible indicators alerted a reasonable consumer to interception or disclosure.

185. Plaintiff and Class Members first learned of Defendant's conduct through investigation conducted in preparation for this action.

## CLASS ACTION ALLEGATIONS

186. Plaintiff brings this action individually and on behalf of the following Class:

> **Nationwide Class**: All persons in the United States who visited the Website that had their Sensitive Information improperly disclosed to Tracking Entities through the use of the Tracking Tools (the "Class").

187. Specifically excluded from the Classes are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by

Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

188. Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Classes should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

189. This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

190. Numerosity (Rule 23(a)(1)): At this time, Plaintiff does not know the exact number of members of the aforementioned Classes. However, given the popularity of Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

191. Typicality of Claims (Rule 23(a)(3)): Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used the Website and had their Sensitive Information collected and disclosed by Defendant.

192. Adequacy of Representation (Rule 23(a)(4)): Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has no interests antagonistic to, nor in conflict with, the Classes. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action

litigation and who will prosecute this action vigorously.

193. <u>Superiority (Rule 23(b)(3))</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class and Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class and Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

194. <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

a) Whether Defendant collected Plaintiff's and the Class's Sensitive Information;

b) Whether Defendant unlawfully disclosed and continues to disclose the Sensitive Information of Users of the Website

c) Whether Defendant's disclosures were committed knowingly; and

    d) Whether Defendant disclosed Plaintiff's and the Class's Sensitive

Information without consent.

195. Information concerning Defendant's Website's data-sharing practices is available from Defendant's or third-party records.

196. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

197. The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

198. Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

199. Given that Defendant's conduct is ongoing, monetary damages are insufficient, and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

## COUNT I - VIOLATION OF THE FEDERAL WIRETAP ACT
### 18 U.S.C. § 2510, et seq.
### (On Behalf of Plaintiff and the Class)

200. 199. Plaintiff incorporates paragraphs 1-198 above as if fully set forth

herein.

201.   Plaintiff brings this cause of action on behalf of himself and all Class Members.

202.   The Federal Wiretap Act, codified at 18 U.S.C. § 2510 et seq. (the "Wiretap Act"), prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

203.   The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

204.   The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

205.   The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

206.   The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

207. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

208. Defendant is a "person" within the meaning of the Wiretap Act.

209. The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

210. Plaintiff had a reasonable expectation of privacy in his electronic communications with Defendant's Website, including his searches, browsing activity, and order-related interactions..

211. A reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on a commercial website are sensitive. Such communications include searches, menu selections, and order interactions. They convey the substance and meaning of the communication.

212. Plaintiff, as a reasonable visitor, is entitled to assume that disclosure of the contents of his communications occurs lawfully and with consent. The opposite assumption would require users to expect routine violations of their privacy.

213. Plaintiff reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of his electronic communications with

Defendant's Website.

214. During the relevant time period, Plaintiff's electronic communications with the Website were intercepted at the moment they were sent and transmitted to Tracking Entities without Plaintiff's consent. The intercepted information was monetized. Defendant combined that information with data collected about Plaintiff across the internet and used it for advertising, analytics, and marketing optimization.

215. Interception occurred whenever Plaintiff interacted with the Website, including when he navigated webpages, used search or location features, viewed menu items, initiated an order, or otherwise communicated information to the Website through his browser.

216. At all relevant times, Defendant acted knowingly, wilfully, and intentionally. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on the Website and understood that doing so would result in the interception and transmission of users' communications to Tracking Entities.

217. Plaintiff was not asked to consent to the interception, recording, disclosure, or use of his electronic communications with the Website by the Tracking Entities. Defendant misled Plaintiff in the privacy policy by telling him that his Sensitive Information would not be shared.

218.   The unauthorized interception and use of Plaintiff's electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

219.   Defendant intercepted Plaintiff's electronic communications for the purpose of disclosing that information to the Tracking Entities. The Tracking Entities used these communications to build personal profiles for the Plaintiff, combining these communications with information from other websites.

220.   Plaintiff's electronic communications were directed to, and intended for, Defendant's Website. Plaintiff did not intend to communicate with Meta, TikTok, Google, Twitter, Reddit, Snapchat, or any other Tracking Entity when he visited the Website, viewed products, conducted searches, or otherwise interacted with the Website.

221.   The disclosure of Plaintiff's communications to the Tracking Entities, despite the statements Defendant made in its privacy policy, was criminal and tortious. This disclosure was fraudulent and constituted an invasion of privacy.

222.   Defendant intercepted and disclosed Plaintiff's communications with the Website without Plaintiff's consent for the purpose of committing a tortious act; a violation of the FSCA.

223.   As a direct and proximate result of Defendant's violations of the

Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

    a. damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiff and any profits made by the intercepting parties as a result of the violations, or

    b. statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

    c. reasonable attorneys' fees and costs.

### COUNT II - VIOLATION OF THE FLORIDA SECURITY OF COMMUNICATIONS ACT
**Fla. Stat. § 934.01, et seq.**
**(On Behalf of Plaintiff and the Class)**

224. Plaintiff incorporates paragraphs 1-198 above as if fully set forth herein.

225. Plaintiff brings this cause of action on behalf of himself and all Class Members.

226. The Florida Security of Communications Act ("FSCA") is codified at Florida Statutes, § 934.01, et seq. The FSCA begins with legislative findings, including "On the basis of its own investigations and of published studies, the Legislature makes the following findings...(4) to safeguard the privacy of innocent persons, the interception of wire or oral communications when none of the parties to the communications has consented to the interceptions should be allowed only

when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court."

227.  Florida Statutes § 934.10 provides, in pertinent part, as follows "Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of §§ 934.04-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate, including: (a) [p]reliminary or equitable declaratory relief as may be appropriate; (b) [a]ctual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of the violation or $1,000, whichever is higher; (c) [p]unitive damages; and (d) [a] reasonable attorney's fee and other litigation costs reasonably incurred."

228.  The FSCA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical systems that affects intrastate, interstate, or foreign commerce." Fla. Stat. § 934.02(12). It further defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

70

229. The FSCA determines the location of the interception of a communication based on ". . . where the communication originates [from]." State v. Mozo, 655 So. 2d 1115, 1117 (Fla. 1995).

230. Communications sent by Defendant's Website to users, including Plaintiff, automatically caused users' browsers to send users' Sensitive Information to the Tracking Entities.

231. At all relevant times, Defendant procured the service of, aided, employed, agreed with, and conspired with Tracking Entities to intercept and use Plaintiff's and Class Members' electronic communications while they accessed and interacted with Defendant's Website.

232. The intercepted and used electronic communications included the substance, import, and meaning of Plaintiff's and Class Members' communications with Defendant's Website, including, without limitation, the URLs visited, menu items viewed, searches performed, selections made, form inputs, order-related interactions, and associated device and session identifiers. This information reflects users' choices, intent, and behavior and constitutes the contents of electronic communications under the FSCA.

233. Plaintiff and Class Members had a reasonable expectation of privacy in their electronic communications with Defendant's Website, particularly where Defendant represented through its Privacy Policy that users' personally identifiable

71

information would not be shared.

234.   Notwithstanding those representations, Defendant intentionally caused Tracking Tools to be embedded and executed on the Website in a manner that recorded and transmitted the contents of Plaintiff's and Class Members' electronic communications to the Tracking Entities contemporaneously with the communications and without users' knowledge or consent.

235.   Defendant willingly facilitated the interception and collection of Plaintiff's and Class Members' communications by embedding and enabling Tracking Tools on its Website and configuring those tools to transmit data to third-party servers in real time.

236.   The Tracking Entities did not act as mere extensions of Defendant or as parties to Plaintiff's and Class Members' communications with the Website. The Tracking Entities used the intercepted communications for their own independent, revenue-generating, commercial purposes.

237.   Defendant used the following items as devices or apparatuses to intercept wire, electronic, or oral communications made by Plaintiff and other Class Members:

    a.   The Website's source code, which contained Tracking Tools that recorded and disseminated the contents of users' communications as they interacted with the Website;

b. Plaintiff's and Class Members' web browsers, which were commandeered and manipulated by the Website's code to transmit communications to Tracking Entities;

c. Plaintiff's and Class Members' computing and mobile devices;

d. Third-Party Web and advertising servers, which received and processed intercepted communications for the Tracking Entities; and

e. Server-to-server communications between Defendant and the Tracking Entities that enabled dissemination of users' communications independent of user-initiated disclosures.

238. Defendant failed to adequately disclose the nature, scope, and real-time operation of the Tracking Tools that automatically transmitted the contents of Plaintiff's and Class Members' communications to third parties for advertising, analytics, and marketing purposes.

239. To avoid liability under the FSCA, a defendant must establish the consent of all parties to the communication. Defendant did not obtain Plaintiff's or Class Members' prior, knowing, and voluntary consent to the interception, disclosure, or use of their electronic communications.

240. By aiding and permitting the Tracking Entities to receive Plaintiff's and Class Members' online communications in real time through the Website without consent or judicial authorization, Defendant violated the FSCA.

73

241.   Defendant's interception and disclosure of Plaintiff's and Class Members' electronic communications violated their statutorily protected privacy rights under Florida law.

242.   As a result of Defendant's violations of the FSCA, and pursuant to Fla. Stat. § 934.10, Plaintiff and Class Members are entitled to actual damages or, in the alternative, liquidated damages of $1,000 or $100 per day for each day of violation, whichever is greater.

243.   Plaintiff and Class Members are further entitled to injunctive and declaratory relief, punitive damages in an amount sufficient to deter similar misconduct, and reasonable attorneys' fees and litigation costs as provided by Fla. Stat. § 934.1.

## COUNT III - INVASION OF PRIVACY
### (On Behalf of Plaintiff and the Class)

244.   Plaintiff incorporates paragraphs 1-198 above as if fully set forth herein.

245.   Plaintiff brings this cause of action on behalf of himself and all Class members.

246.   Florida recognizes the tort of invasion of privacy, including intrusion upon seclusion or intrusion into private affairs.

247.   Under Florida law, intrusion upon seclusion occurs where a defendant physically or electronically intrudes into one's private quarters in a manner that

would be highly offensive to a reasonable person.

248. Plaintiff and the Class Members possessed legally protected privacy interests in the data resting on Plaintiff's devices and their private online activities, including their browsing history, page interactions, form inputs, device identifiers, session data, geolocation data, and other personal information transmitted while using Defendant's Website.

249. Plaintiff and Class Members had a reasonable expectation that their private online browsing activity and related personal information would not be intercepted, recorded, or transmitted to third parties beyond what was necessary for basic website functionality—particularly where Defendant represented through its privacy policy that users' personally identifiable information would not be disclosed to the Tracking Entities

250. Defendant intentionally placed third-party Tracking Tools on the Website—including cookies, pixels, scripts, and related technologies—to intercept, collect, record, transmit, and compile Plaintiff's and Class Members' Sensitive information.

251. Such interception and transmission occurred without valid consent and without the knowledge of Plaintiff and Class Members.

252. Defendant's conduct constituted an intentional and wrongful electronic intrusion into Plaintiff's and Class Members' private quarters.

253.   Defendant purposefully placed the Tracking Tools on Plaintiff's and Class Members' browsers, computers and/or mobile devices, invading their private quarters. Sensitive Information was intercepted, procured from, and/or transmitted to the Tracking Entities from the Tracking Tools placed on Plaintiff's and Class Members' devices. This Sensitive Information was then combined with Sensitive Information gathered from third-party websites, also making use of the Tracking Tools to build comprehensive marketing profiles of users, including Plaintiff and Class Members.

254.   The intrusion described herein would be highly offensive to a reasonable person, particularly where Defendant represented that users could control or limit such tracking and nevertheless permitted third parties to access and exploit users' private browsing communications.

255.   Defendant lacked any legitimate business necessity to permit the Tracking Entities to intercept and collect users' private online activity in a manner inconsistent with its privacy representations.

256.   As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members suffered injury, including but not limited to invasion of their private affairs, loss of privacy, loss of control over their Sensitive Information, emotional distress, and other compensable harms.

257.   Defendant's conduct was willful, knowing, and in reckless disregard

of Plaintiff's privacy rights, entitling Plaintiff and the Class to punitive damages under Florida law.

258.   Plaintiff and the Class seek all available relief under Florida law, including compensatory damages, punitive damages, costs of litigation, and such other relief as the Court deems just and proper.

### COUNT IV - COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
**(On Behalf of Plaintiff and the Class)**

259.   Plaintiff incorporates paragraphs 1-198 above as if fully set forth herein.

260.   Plaintiff brings this cause of action on behalf of himself and all Class Members.

261.   Defendant made affirmative representations to users through the privacy policy.

262.   Defendant represented that the Tracking Entities would not collect personally identifiable information, and that personal information input to the website by users would only be used for their stated purpose.

263.   Defendant made these representations when users accessed the Privacy Policy.

264.   These representations were false and misleading. Tracking Entities, such as Facebook through the c_user cookie and TikTok through email addresses, collected users' personally identifiable information when users browsed the

Website. Additionally, when users logged in to the Website, their email addresses were disclosed to TikTok for analytics and marketing purposes.

265. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated on the Website.

266. Defendant had the technical ability to preventthe Tracking Tools from disclosing personally identifiable information to the Tracking Entities.

267. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiff, by reassuring them that their personally identifiable information would not be disclosed to the Tracking Entities, while Defendant continued to collect and transmit personally identifiable information for its own commercial benefit.

268. Plaintiff and the Class Members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website a instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

269. Plaintiff's reliance was reasonable because Defendant made affirmative representations in the Website's privacy information that Plaintiff's personally identifiable information would not be disclosed.

270. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff and the Class Members suffered damages, including loss of privacy, loss of control over their Sensitive Information, and diminution in the value of their personal data.

271. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would not occur.

272. Plaintiff and Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

## COUNT V - UNJUST ENRICHMENT
### (On behalf of Plaintiff and the Class)

273. Plaintiff incorporates paragraphs 1-198 above as if fully set forth herein.

274. Plaintiff brings this cause of action on behalf of themselves and all Class Members.

275. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiff's and Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

276. Defendant retained those benefits under circumstances in which the information was collected and transmitted without valid consent. The information was collected and transmitted in breach of Defendant's representations to users. Defendant's retention of those benefits is unjust.

277. Plaintiff and Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiff and the Class. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiff and Class Members are entitled to the relief set forth below.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a) For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Class and their counsel as Class Counsel;

b) For an order declaring the Defendant's conduct violates the statutes referenced herein;

c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

d) Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to

immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

e)  An award of statutory damages or penalties to the extent available;

f)  For damages in amounts to be determined by the Court and/or jury;

g)  For pre-judgment interest on all amounts awarded;

h)  For an order of restitution and all other forms of monetary relief;

i)  An award of all reasonable attorneys' fees and costs; and

j)  Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

DATED: February 19, 2026          Respectfully submitted,

**SHAMIS & GENTILE, P.A.**

*/s/ Christopher Berman*
Christopher Berman (1010654)
Tonyia J. Johnson  (1058251) (Admission
 pending)
14 NE 1st Ave., Suite 705
Miami, Florida 33132
Tel: (305) 479-2299
Email: cberman@shamisgentile.com
Email: tjohnson@shamisgentile.com

Mark S. Reich*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500

81

Facsimile: (212) 363-7171
Email: mreich@zlk.com

*pro hac vice* forthcoming

*Attorneys for Plaintiff and the
Proposed Class*